Doug Beavers for Mr. Kegler. I'd ask to reserve three minutes. The district judge's legal conclusion applying the Cormier factors in this case should be reversed because it was not supported by the judge's own factual findings. Primarily the judge found that Deputy Palmer, his testimony was credible and but none of Deputy Palmer's testimony supports any of the five factors that this Court has used in the past or any factors I can think of. Well, but the main factor is that he asked for the search. That Deputy Palmer asked for the search. No, that Kegler asked for the search. He said, look for my sweatshirt. And that's how the search got started. That's the beginning of the search. But that's not that search finished when the sweatshirt was not found. And then Deputy Palmer's search was over. Mr. Palmer, he said, okay, search whatever you want. He didn't say it was finished. And if you believe Palmer and not Kegler, then he still had permission to search for the sweatshirt. No? No, because the search for the sweatshirt had started, completed, and then ‑‑ It completed because it was ‑‑ I mean, in one version because it was found, but in another version because it wasn't found. Which one? Well, it wasn't found, is Deputy Palmer's version. And then he then ‑‑ No, but he didn't believe Palmer's version. I'm sorry? I mean, he believed Palmer's version. Go ahead. It was found or it wasn't found? It wasn't found. It wasn't found. Right. And then Deputy Palmer says that he noticed there were so many things in the room, he started asking Mr. Kegler about what do you want to do with your stuff? Right. Do you want me to take it and search it? And that's how he asks, can I search it on page 116? That's a search. There's other conversation, but that's a request for a search. And there's no spontaneous ‑‑ this isn't a spontaneous request to search, some spontaneous request of the officer to go search something. But doesn't he request to search it because at that point they're discussing whether to leave it there or to take it? And because he says, I'm not putting this in my car. If there's anything here, I've got to go through it. Isn't that what was happening at that point? That is the language of the request. Right. And it's phrased in a serpentine way that it's not saying, can I search your stuff so that I can take it? But I don't think that wording makes any difference. But doesn't it make a difference? Because he doesn't have to let him search it. He can leave it there. Even if he thinks that leaving it there would mean he never gets it back, that might be a choice someone might make so that they don't find drugs or a gun and get a prosecution based on that. But it's not clear that ‑‑ well, it's clear he's never told you can refuse consent and what will happen as a result of this. Well, he says he knew he could leave it at the hotel and his family could come get it. He says he knew that if it was left at the hotel, but there's never any discussion of whether the search is going to go ahead anyway. Well, I thought the idea was the officer said what Judge Cardone just said. I have to search it if I'm going to put it in my car or if it's going to go into the jail. That's right. But the officer doesn't say that if you don't consent, it's going to be turned over to the hotel and it's going to stay here. Didn't the officer tell him that if you don't consent, it's going to stay here and go to lost and found for 30 days? And then be thrown away. So that would be an option. I mean, I think your client didn't even believe that because he thought his family could come get it. But if he thought it would get thrown away, it seems like getting thrown away is an option other than searching when you know you've got drugs and a gun. That would be an option. And if that — but it doesn't get around the fact that that's still an indirect request for consent to search the bags in a — But at a minimum, at a minimum, these circumstances are sufficiently unique that it doesn't seem very useful to apply these five factors mechanically to it, does it? I mean, they're just really odd. Well, they're odd, but they're the type of factors that are likely to happen again and again. Well, the factors, to be frank, don't make a lot of sense in their own regard, but they certainly don't make a lot of sense as applied here. Well, and if they don't cover the circumstance, then maybe additional factors should be presented, but the government's presented factors that are unworkable. Subjective intent of the officer that — to not search, that's — Not subjective. It was subjective. There seemed to be common ground between the officer and the defendant that he could leave the objects there and they would be either picked up by his family or confiscated after 30 days. That seemed to be a common understanding, right? That's — that was the nature of the discussion. Right. And — but the government's arguing that it's the officer's subjective intent not to search that gets this out of Cormier, and I don't see that. That would be — But what if we — I mean, that's your reading of their argument, but we don't have to agree with their argument necessarily to affirm, right? What if we just think this is out of Cormier because it's — because it all started when the defendant asked them to start searching things? That could be a new factor that if a defendant starts the conversation about items, but that's very unbounded and doesn't lead to any clear solution because he's asking for a certain specific item, and then — But it's a bigger item than — I mean, if you're looking for a sweatshirt, you can open a lot of things, right, to try to find one? It's possible, but the discussion here starts with very specific locations, and then the officer turns it around toward a broader search, and he's — maybe he wants to look for more things to find it or maybe doesn't. And Palmer said, I don't care, search whatever you want. Right? That's what he said he said. Right. No, Palmer said that Keckler said. Right? That's the statement. And we have to assume that the judge believed that, right? Yes. So — and that was in response to that you have to — that if we're going to take the stuff with you, we have to search. He said, fine, search. How is that anything but consent? Well, it comes immediately after the doors burst in by five armed — five or more armed officers. It's not immediately after. It's after he asked him to search for his sweatshirt, and he did. I mean, that's the odd factor here. So it's a continuation of that search rather than — or looking for rather than being directly after the invasion, so to speak. It's — that could be perhaps one factor, but it's still one factor against all the other factors. But going back to whether the factors even apply, aren't there so many differences here in this case? First of all, they already had the arrest warrant. It's not like they're going in because of some other exigent circumstance. They have arrest warrant for this guy. They know that he's going to be under arrest. They put him — they sit him down in a chair. They put the handcuffs on him or whatever. And meanwhile, he says, I know I'm going to jail. Please look for a sweatshirt. Right? By then, there's no guns. The guys are in a different room. And he starts searching for the sweatshirt. Not only does he search for the sweatshirt, but then he gives a combination to a locked — because they can't find the sweatshirt anywhere else, he has a locked suitcase, and he gives the combination. I mean, he's obviously cooperating with the officers and giving the combination. And then at some point later on, which is when he's saying — talking about whether or not he's going to take the items with him, he gives — Kegler gives the combination to the safe. I mean, he is totally in tune with the officer taking these things. How is — how do these factors even apply in this case? Well, because it's a request for a search, and the cases have all said that the factors apply when someone asks for consent to search. There are unique factors. He's not searching for — because he thinks a crime has been committed. The crime's already been committed. That's why the guy's under arrest. He's searching because the guy wants him to take the stuff to the police station, right? That's — if we go into the subjective mind of the officer, that may be true, may not be true. The objective fact is that he's doing an arrest — he's executing an arrest warrant. But it wasn't even a request for a search. That's the problem. Well, he said, you know, if you want me to take this material, then I'm going to search it. But he doesn't say, I want to search it just, you know, by itself. And then he says, fine, search it. So even that was instigated by the defendant, that is, taking it to the jail. There are many consent cases. In many of the consent cases, they follow on other conversations. I think I'm out of time. Thank you very much. Thank you. Good morning, Your Honors. May it please the Court, Paul Hemesath on behalf of the United States. Your Honors, it is Supreme Court precedent that a search conducted pursuant to a valid consent is constitutionally permissible. Do you think, listening to everything that happened before, that we might have known that? I'm sorry? I mean, I'm just questioning, you know, in light of what I said before about not arguing what you don't have to argue. Yeah. Perhaps we know that. Nothing more, Your Honor. And simply what I would say then in that case is that this is a matter of a fact-finding on behalf of the district court judge. This is a matter of whether or not there was clear error. There is a difference between what Detective Palmer says and what the defendant says. This is a totality of the circumstances standard. Yes, there is a five-factor test, but every decision that applies this says that it should not be applied in a mechanical way, that the five factors are merely guideposts. This works in both directions. If there were some other factor that went against the government, I don't think the government would say that we can't consider that factor. It's a totality of circumstances. And the elephant in the room in this case, as the court has pointed out, is simply that Mr. Kegler offered his consent. There was no overbearing of will. But wasn't the consent just to look for the sweatshirt? No. Well, at first it was, I suppose, but then at a certain point, as the court has pointed out, Mr. Kegler says, search whatever you want. And so you look at the all of the other cases that consider these types of questions and whether there's an overbearing of will, whether there is coercive language. To the contrary, here you have police officers that appear to be nice police officers going out of their way to get the sweatshirt. They barged into his room forcibly. And there were a bunch of them and they all had guns. They weren't so nice. Well, they became nice, we'll say. And this is certainly after, by the way, that there were some factors leading the police officers to believe that they had good reason to do all of that. I'm not saying that. I'm just saying that to characterize them. This is all as a pleasant conversation between friends. It wasn't. Perhaps not between friends, but it was entirely appropriate and it is a model for police officers, actually, to accommodate reasonably what the defendant happens to be asking for at that time. Your Honor, I could go on. It's totally crazy, but nonetheless, for somebody who knew that there was contraband in his suitcases, but nonetheless, that's what he was doing. No one has suggested that Mr. Kegler in his state was a logical person. So I could go into more detail unless Your Honors have further questions I would submit. Well, to you, does it make a difference, as appellant says, that the officer made that request for the search at the point that he was talking about taking the things to the station? Does it make a difference that the officer made the request? Yeah, he said, can I search your stuff? I mean, it's in response to the contextual question of whether or what was going to happen to the stuff. So where I think it would make a difference is if it entered into the territory of an interrogation or a further investigation, and there's no other evidence of that. This is simply in the context of whether or not the stuff is going to stay here or it's going to go away. So was there a question with regard to that? Yes. Was it an interrogation? No. How about after he finds the drugs and then goes out in the hallway and comes back and vizes them his rights, and by then they're talking about a gun? Is that a different level there? Well, at that point there's certainly a slightly different justification in that the question at that point is, hey, is there anything dangerous that we need to worry about in these bags, which in this context is also a perfectly permissible question, and we're not talking about an interrogation. It is not, we know you're a bad guy, show us whatever it is that they're looking for. It is simply, do we have to worry about anything in this bag? Well, that doesn't seem like a very big difference, but this was all post-Miranda at that point, right? At that point it was post-Miranda. She didn't have to say anything. That's correct. And the search was preceded by a question, i.e., is there anything we should be looking for? And he said, yes, a gun. Yes, which by the way— So it wasn't really at that point, well, I suppose there's still a question of whether they were consenting to the search, but they knew there was a gun there, so it seems at a minimum harmless because he said there was a gun. That and the fact that Mr. Kegler says that that conversation never actually happened. He denies that he told them— Either we believe Palmer or we don't believe Palmer. Right. And we're supposed to believe Palmer because the district court did, right? The district court believed Palmer. Okay, if you have nothing more, thank you. Thank you. Thank you, sir. Well, you can have a minute and 14 seconds. How about that? As to the discussion of the last—the statement about a gun being in the bag, that—if that—first problem with that is the judge never made any findings that Officer Halverson was telling the truth. I thought he made a generic finding that Officer Palmer was telling the truth. Officer Palmer is the one, but Officer Halverson is the one who said he asked, do you have any guns or needles in there? Okay. And at the time he said that, Officer Halverson had already been briefed that Mr. Kegler had a criminal record, which was a felony, and so that would be a direct Miranda violation. But what I don't understand about that is the search seems the least of it at that point. I mean, that is—the testimony was I asked him whether he had anything, and he said he had a gun. So the search was almost irrelevant at that point. He said he had a gun. Your Honor, actually, the Officer Halverson's testimony is that Mr. K—he asked Mr. Kegler, do you have a gun or needles or a knife. Right. Or anything dangerous. And at that point it was after Mr. Kegler had already invoked Miranda rights, so that would be a Miranda violation, and it would be a direct violation of Miranda for questioning— Did you raise that question as a Miranda problem? No, because that's not anything that the court relied on. The court didn't rely on Officer Halverson's testimony or this response to questioning at that point. The district judge's finding is not very clear as to which statement he's talking about, but he does say the officer's observations. I'm not sure what the district judge meant by those observations. Okay. Thank you very much. The case of United States v. Kegler is submitted. We'll go to United States v. Rodriguez.
judges: Berzon, Friedland, Cardone